WEST PLAINS ELECTRIC CO-
OPERATIVE, INC., Peti-
tioner and Appellant,

v.

PETROLEUM TANK RELEASE
COMPENSATION FUND,
Respondent and Appellee.

Civ. No. 920050.

Supreme Court of North Dakota.

July 28, 1992.

Mackoff, Kellogg, Kirby & Kloster, PC,
Dickinson, for petitioner and appellant, ar-
gued by Paul F. Ebeltoft, Jr., Dickinson.

William E. Maxwell (argued), Legal
Counsel, North Dakota Ins. Dept., Bis-
marck, for respondent and appellee, ap-
pearance by Trent C. Heinemeyer, Asst.
Atty. Gen.

ERICKSTAD, Chief Justice.

West Plains Electric Cooperative, Inc.,
appeals from the judgment of the District
Court for Burleigh County affirming the
order of the Commissioner of Insurance
denying West Plains' application for reim-
bursement from the Petroleum Tank Re-
lease Compensation Fund for costs associ-
ated with cleaning up a petroleum spill.
We reverse.

West Plains Electric Cooperative, Inc., is
an electrical power distribution cooperative.
As part of its operations, West Plains oper-
ated an aboveground tank in which petrole-
um and pentachlorophenol were stored.
West Plains discontinued using the tank in
September of 1986 and had the tank re-

moved in June of 1988. However, unbeknown to West Plains and prior to its discontinued use in September of 1986, the aboveground tank released petroleum and pentachlorophenol into the surrounding environment. This release was discovered in August of 1989 as West Plains began a planned excavation and removal of two underground tanks which were situated directly below the aboveground tank. On October 17, 1989, and again on May 31, 1990, West Plains applied for Fund reimbursement for the cleanup costs associated with the release. The Fund denied West Plains' applications for reimbursement for the reason that the tank in question was not registered with the Fund at the time the release was discovered. West Plains subsequently attempted to "retroactively" register the tank. However, the Fund refused to register the aboveground tank and the two underground tanks which were removed. West Plains thereafter sought further administrative review. The matter was submitted to an independent hearing officer who determined that West Plains was not entitled to participate in the Fund because the tank in question was not registered with the Fund at the time the release was discovered. The Commissioner of Insurance affirmed the hearing officer's recommendations and West Plains thereafter sought judicial review. On February 5, 1992, the district court affirmed the Commissioner of Insurance's order. This appeal followed.

■ In 1989, the Legislative Assembly created the Petroleum Release Compensation Fund. See 1989 S.L. ch. 341.[1] This fund was designed to reimburse eligible owners and operators of petroleum tanks for certain costs associated with the cleanup of petroleum spills. The creation of the Fund was partly in response to petroleum tank owners' and operators' inability to comply with increasingly stringent federal financial responsibility regulations through the purchase of commercial pollution liability insurance.[2]

1. The 1989 Act creating the Petroleum Release Compensation Fund contained a two-year sunset provision and, accordingly, was not published in the North Dakota Century Code. New legislation surrounding the Petroleum Release Compensation Fund was enacted in 1991. See 1991 S.L. ch. 299, 300.

2. The pertinent federal EPA regulations surrounding financial responsibility requirements include the following:

"§ 280.12 Definitions.
* * * * * *

"'Tank' is a stationary device designed to contain an accumulation of regulated substances and constructed of non-earthen materials (e.g., concrete, steel, plastic) that provide structural support.
* * * * * *
"'Underground storage tank' or 'UST' means any one or combination of tanks (including underground pipes connected thereto) that is used to contain an accumulation of regulated substances, and the volume of which (including the volume of underground pipes connected thereto) is 10 percent or more beneath the surface of the ground.
* * * * * *
"§ 280.91. Compliance dates.
"Owners of petroleum underground storage tanks are required to comply with the requirements of this subpart by the following dates:
(a) All petroleum marketing firms owning 1,000 or more USTs and all other UST owners that report a tangible net worth of $20 million or more to the U.S. Securities and Exchange Commission (SEC), Dun and Bradstreet, the Energy Information Administration, or the Rural Electrification Administration; January 24, 1989, except that compliance with § 280.-94(b) is required by: July 24, 1989.
(b) All petroleum marketing firms owning 100–999 USTs'; October 26, 1989.
(c) All petroleum marketing firms owning 13–99 USTs at more than one facility; April 26, 1990.
(d) All petroleum UST owners not described in paragraphs (a), (b), or (c) of this section, including all local government entities; October 26, 1990.
* * * * * *
"§ 280.93 Amount and scope of required financial responsibility.
"(a) Owners or operators of petroleum underground storage tanks must demonstrate financial responsibility for taking corrective action and for compensating third parties for bodily injury and property damage caused by accidental releases arising from the operation of petroleum underground storage tanks in at least the following per-occurrence amounts:
(1) For owners or operators of petroleum underground storage tanks that are located at petroleum marketing facilities, or that handle an average of more than 10,000 gallons of petroleum per month based on annual throughput for the previous calendar year; $1 million.

The Act creating the Fund named the manager of the State Fire and Tornado Fund under the Commissioner of Insurance as the administrator of the Fund. The administrator was charged with administering the Fund and adopting rules regarding its practices and procedures. The Fund was primarily financed through a nine-fortieths of a cent per gallon tax on gasoline and other petroleum products. The tax was to remain in effect until the Fund accumulated three million dollars, and was to be reinstated if the Fund fell below one million dollars.

As both parties assert, our task in this case is one of construing the 1989 legislation establishing the Petroleum Release Compensation Fund. Specifically, we must determine whether or not West Plains is entitled to reimbursement from the Fund and, relatedly, whether or not the Fund's promulgation of section 45–10–01–06, N.D.Admin.Code (1990), was statutorily authorized.[3]

In construing legislation, "[o]ur duty is to ascertain the intent of the Legis-

(2) For all other owners or operators of petroleum underground storage tanks; $500,000.

"(b) Owners or operators of petroleum underground storage tanks must demonstrate financial responsibility for taking corrective action and for compensating third parties for bodily injury and property damage caused by accidental releases arising from the operation of petroleum underground storage tanks in at least the following annual aggregate amounts:

(1) For owners or operators of 1 to 100 petroleum underground storage tanks, $1 million; and

(2) For owners or operators of 101 or more petroleum underground storage tanks, $2 million.

"(c) For the purposes of paragraphs (b) and (f) of this section, only, 'a petroleum underground storage tank' means a single containment unit and does not mean combinations of single containment units.

\* \* \* \* \* \*

"§ 280.101 State fund or other state assurance.

"(a) An owner or operator may satisfy the requirements of § 280.93 for underground storage tanks located in a state, where EPA is administering the requirements of this subpart, which assures that monies will be available from a state fund or state assurance program to cover costs up to the limits specified in § 280.93 or otherwise assures that

lature." *County of Stutsman v. State Historical Soc.*, 371 N.W.2d 321, 325 (N.D. 1985). Although a "statute must be considered as a whole to determine the intent of the Legislature[,] [t]he Legislature's intent must be sought initially from the statutory language." *Id.* "If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursuing its spirit because the legislative intent is presumed clear from the face of the statute." *Id.;* section 1–02–05, N.D.C.C.

Section 22 of the 1989 Act reads:

"*Reimbursement for corrective action.* The administrator shall reimburse an eligible owner or operator for ninety percent of the costs of corrective action, including the investigation, which are greater than seven thousand five hundred dollars and less than one hundred thousand dollars. A reimbursement may not be made unless the administrator determines that:

1. At the time of release, the owner or operator and the tank were in com-

such costs will be paid if the Regional Administrator determines that the state's assurance is at least equivalent to the financial mechanisms specified in this subpart."

40 CFR Part 280, Subpart A, H (1989).

In testimony before the House Natural Resources Committee on House Bill 1297, Lowell Ridgeway, speaking on behalf of the North Dakota Petroleum Council, said: "As a final observation, we do not believe HB–1297, as drafted, meets the EPA requirements for an approved state underground tank fund."

Testifying in favor of HB–1297, Martin R. Schock, Director of the Division of Waste Management with the North Dakota Department of Health and Consolidated Laboratories, said: "In summary, the Department supports HB 1297, not only because it addresses the needs of owners of regulated underground storage tanks, but also corrective action for releases from other non-regulated tanks whether below ground or above ground."

3. Section 45–10–01–06, N.D.Admin.Code (1990), reads in relevant part:

"No reimbursement may be made from the fund to the owner or operator of a tank unless the tank has been properly registered and the registration fee of twenty-five dollars for an underground tank and ten dollars for an aboveground tank has been paid prior to the discovery of the release."

pliance with state and federal rules and rules applicable to the tank, including rules relating to financial responsibility which were in effect at the time of the release;

2. The department was given notice of the release as required by federal and state law;

3. The owner or operator has paid the first seven thousand five hundred dollars of the cost of corrective action; and

4. The owner or operator, to the extent possible, fully cooperated with the department and the administrator in responding to the release."

Section 23 of the 1989 Act reads:

*"Application for reimbursement.* Any owner or operator who proposes to take corrective action or has undertaken corrective action in response to a release, the time of such release being unknown, may apply to the administrator for partial or full reimbursement under section 22 of this Act. An owner or operator may be reimbursed only for releases discovered and reported after the effective date of this Act."

Section 2(11) of the 1989 Act defines "release" as follows:

"11. 'Release' means any unintentional spilling, leaking, emitting, discharging, escaping, leaching, or disposing of petroleum from a tank into the environment whether occurring before or after the effective date of this Act, but does not include discharges or designed venting allowed under federal or state law or under adopted rules."

Section 21 of the 1989 Act reads:

*"Registration fee.* An owner or operator of a tank shall pay an annual registration fee of ten dollars for each aboveground tank and twenty-five dollars for each underground tank owned or operated by that person. The registration fees collected under this section must be paid to the administrator for deposit in the state treasury for credit to the petroleum release compensation fund."

On appeal, the Fund asserts that the above provisions of the Act, when read together, implicitly require registration prior to discovery of a release in order to be eligible for reimbursement.[4] A contrary interpretation, the Fund asserts, would render the registration requirements of section 21 meaningless because there would then be no incentive to register. However, such an assertion first overlooks the incentive from the criminal penalty provision in section 20 of the Act.[5] Also, section 22 requires that, at the time of the release, the owner or operator and the tank be in compliance with state and federal rules rel-

---

**4.** The initial version of HB 1297 as introduced contained no fee registration provision. Apparently, partially in response to testimony and proposed amendments by the North Dakota Petroleum Council, a provision for registration fees was added. Lowell Ridgeway, representing the North Dakota Petroleum Council, testified before the House Natural Resources Committee regarding a fee registration provision as follows:

"Our second concern with the bill is the mechanism for funding. Section 17 provides for an increase in the current ¼th cent petroleum product inspection fee to nine-fortieths of a cent. We strongly support this fee. But we also believe any underground storage tank cleanup fund should be partially financed by a modest annual tank registration fee, of say $20 per year per tank.

"The way HB-1297 currently reads, the citizens, through a nine-fortieths of a cent fee, are unfairly paying the entire amount in the fund, while providing virtually no incentive for tank owners and operators to establish leak prevention programs. We believe a tank owner should make some contribution to the fund.

"Probably more important, an annual tank fee would help the State Health Department regulate the installation, updating and abandonment of tanks across the state. We firmly believe that strong enforcement must be an element of a successful program. Our second amendment provides for this tank registration fee."

**5.** Under the 1991 Act relating to the Petroleum Release Compensation Fund, section 16, the criminal penalty provision of the 1991 Act, provides that a "tank owner violating section 17 [the registration requirements] of this Act is guilty of a class B misdemeanor." *See* 1991 S.L. ch. 299, sections 16, 17.

ative to the tank, including rules relating to financial responsibility. Presumably, this would include the registration requirement in section 21 of this Act if the release were to have occurred after registration was required.

■ In any case, the Fund asserts that the Act was only intended to cover releases from tanks which were in existence on the effective date of the Act. We do not agree.

The definition of "release" within the Act clearly contemplates Fund reimbursement for corrective action taken on spills occurring before the effective date of the Act. Section 22, that part of the Act specific to reimbursement, focuses solely on whether or not the owner or operator and the tank were in compliance with federal and state rules governing the tank *at the time of release.* Section 23 only requires that the release be not previously discovered and reported prior to the effective date of the Act for an applicant to be eligible for reimbursement.

Although the Act does not specifically address previously removed tanks, the language pertaining to reimbursement is clear and unambiguous. Under a plain reading of the Act, West Plains is entitled to reimbursement. By denying West Plains' application for reimbursement because the tank in question was not registered at the time the release was discovered, and not in existence on the effective date of the Act, the Fund has added by rule, requirements for reimbursement not in the Act.

■ A basic rule of administrative law is that "an administrative regulation may not exceed statutory authority or supersede a statute, and that a regulation which goes beyond what the Legislature has authorized is void." *Moore v. North Dakota Workmen's Comp. Bureau,* 374 N.W.2d

71, 74 (N.D.1985). Relative to this case, section 5 of the Act provides:

*"Adoption of rules.* The administrator shall adopt rules regarding its practices and procedures, the form and procedure for applications for compensation from the fund, procedures for investigation of claims, procedures for determining the amount and type of costs that are eligible for reimbursement from the fund, and procedures for persons to perform services for the fund."

We conclude that when the Commissioner denied West Plains' application for reimbursement because the tank in question was not registered at the time of discovery of the release, and not in existence on the effective date of the Act, the Commissioner added requirements for reimbursement which were not statutorily authorized, and, accordingly, the Commissioner erred. This conclusion is consistent with the obvious objective of the Act which was the cleanup of spills, which could not be advanced without reporting and likely would not be reported as conscientiously as necessary if the incentive of reimbursement for costs were not existent under the Act.

The judgment of the district court is, accordingly, reversed and this case is remanded to the Commissioner of Insurance for appropriate disposition.

VANDE WALLE, LEVINE, MESCHKE and JOHNSON, JJ., concur.